10 CIV 4791

JUDGE KAPLAN

**GEORGE S. CANELLOS**
**REGIONAL DIRECTOR**
**Andrew M. Calamari**
**Celeste A. Chase**
**Joseph O. Boryshansky**
**Susannah M. Dunn**
**Joshua R. Pater**

**SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
3 World Financial Center, Suite 400
New York, NY 10281
Tel: (212) 336-1100



RECEIVED
JUN 21 2010
U.S.D.C. S.D. N.Y.
CASHIERS

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>Plaintiff,<br><br>- against -<br><br>**ICP ASSET MANAGEMENT, LLC, ICP SECURITIES, LLC, INSTITUTIONAL CREDIT PARTNERS, LLC, and THOMAS C. PRIORE,**<br><br>Defendants. |

No. 10 Civ. _____

**COMPLAINT AND**
**JURY DEMAND**

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against defendants ICP Asset Management, LLC ("ICP"), ICP Securities, LLC ("ICPS"), Institutional Credit Partners, LLC a/k/a or d/b/a ICP, LLC or ICP Capital, LLC ("ICP Holdco"), and Thomas C. Priore ("Priore") (collectively, "Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      The Commission brings this action against the investment advisory firm ICP, its founder, owner and president, Thomas Priore, its affiliated broker-dealer, ICPS, and its holding company, ICP Holdco, for repeated violations of the federal securities laws. Since 2006, ICP has

managed several investment vehicles, including four multi-billion-dollar collateralized debt obligations, known as the Triaxx CDOs, whose assets primarily consisted of mortgage-backed bonds. Starting in 2007, as the mortgage markets increasingly deteriorated, ICP and the other Defendants engaged in a range of improper transactions that defrauded the Triaxx CDOs of tens of millions of dollars and placed them at risk of substantial additional losses in the future.

2. As the markets declined, ICP and the other Defendants repeatedly caused the Triaxx CDOs, their advisory clients, to overpay for bonds — often in order to protect another ICP client from realizing losses or to make money for ICP. To take just one example of many dozens, ICP caused a CDO to purchase approximately $22 million of mortgage bonds from another client account at a price of $75 per bond, even though ICP had purchased the same bonds into that client account, earlier in the day, at only $63.50 per bond. (When first issued, each bond is priced at "par" or $100 but its market price may decline over time.) This trade defrauded the CDO of approximately $2.5 million. In another example, ICP caused two Triaxx CDOs to purchase from another ICP client approximately $9 million of bonds at a price of $99.22 per bond, just days after ICP had purchased the same bonds in the open market at only $78.63 per bond. ICP also caused several Triaxx CDOs to purchase bonds from another CDO at artificially-inflated prices to help the latter meet the margin calls of one of its creditors. In total, ICP and Priore directed more than a billion dollars of trades by the Triaxx CDOs at what they knew were inflated prices.

3. ICP also defrauded the Triaxx CDOs by structuring trades in ways that disadvantaged the CDOs and allowed ICP and its affiliates to reap massive, risk-free, and undisclosed profits at the CDOs' expense. For example, in the summer of 2007, after the CDOs had purchased a large portfolio of mortgage bonds, ICP fraudulently altered the trade to pocket a

$14 million profit for itself. ICP did so by directing the brokers from whom the CDOs had purchased the bonds — weeks after the trade had taken place — to cancel the transaction and rebook it, only this time replacing affiliates of ICP for the CDOs as the purchasers. ICP enriched itself and its affiliates with undisclosed markups in various other transactions it made on behalf of the CDOs.

4.      The Defendants' abuses of their fiduciary responsibilities to clients included numerous other improper practices, such as entering into prohibited investments, failing to obtain required approvals for trades, misrepresenting the value of holdings, and deceiving clients, investors, and other parties about the CDOs' investments. By early 2010, the bulk of the bonds held by the Triaxx CDOs, which had once been AAA-rated, had been downgraded to "junk bond" status, leaving investors with heavily-impaired collateral and exposing them to potentially massive losses as the CDOs mature.

5.      By directing the transactions described in this Complaint, ICP and the other Defendants put their interests ahead of their advisory clients and improperly obtained tens of millions of dollars in fees and undisclosed profits at the expense of clients and investors.

### SECURITIES LAWS VIOLATIONS

6.      By virtue of the foregoing conduct and as alleged further herein, the Defendants, directly or indirectly, singly or in concert, have engaged in acts, practices, schemes, and courses of business that violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. 240.l0b-5]. Defendant ICPS also violated Section 15(c)(1)(a) of the Exchange Act [15 U.S.C. § 78o(c)(1)(A)] and Rule 10b-3 thereunder [17 C.F.R. 240.l0b-3]. In addition, Defendants ICP and Priore violated Sections

206(1), 206(2), 206(3), and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1)-(4)] and Rule 206(4)-8 thereunder [17 C.F.R. 275.206(4)-8], and ICP violated Section 204 of the Advisers Act [15 U.S.C. § 80b-4] and Rules 204-2 and 206(4)-7 [17 C.F.R. 275.204-2 and 275.206(4)-7].

7.      In addition, each of the Defendants aided and abetted the other Defendants' violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.l0b-5], and Defendants ICP and Priore aided and abetted ICPS's violations of Section 15(c)(1)(a) of the Exchange Act [15 U.S.C. § 78o(c)(1)(A)] and Rule 10b-3 thereunder [17 C.F.R. 240.l0b-3].  Defendants ICPS, ICP Holdco, and Priore also aided and abetted ICP's violations of Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. 275.206(4)-8], and Priore aided and abetted ICP's violations of Section 206(3) of the Advisers Act [15 U.S.C. § 80b-6(3)].

8.      Finally, at all times relevant to the charges contained in this Complaint, Defendant Priore was a controlling person of Defendants ICP and ICPS pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], and is therefore liable as a control person for ICP's and ICPS's violations of the Exchange Act.

9.      Unless each of the Defendants is permanently restrained and enjoined, they will again engage in the acts, practices, transactions, and courses of business set forth in this Complaint and in acts, practices, transactions, and courses of business of similar type and object.

## JURISDICTION AND VENUE

10.      The Commission brings this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)] seeking, among other things, to restrain and

enjoin permanently the Defendants from engaging in the acts, practices, transactions, and courses of business alleged herein. In addition to injunctive relief, the Commission seeks: (a) final judgments ordering the Defendants to disgorge their ill-gotten gains, with prejudgment interest; (b) final judgments ordering the Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and (c) such equitable and other relief as the Court deems just, appropriate or necessary for the benefit of investors [15 U.S.C. § 78u(d)(5)].

11.     This Court has jurisdiction over this action, and venue lies in this District, pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14]. The Defendants, directly or indirectly, have used the mails and the means and instrumentalities of interstate commerce in connection with the acts, practices, transactions, and courses of business alleged herein, many of which occurred in this District. In addition, the Defendants transacted business and maintained offices in this District throughout the relevant period.

**DEFENDANTS**

12.     **ICP Asset Management, LLC (ICP)** is a Delaware corporation headquartered in New York. ICP is engaged in providing investment and trading advice relating to various structured fixed income instruments, including mortgage-backed bonds and other asset-backed securities. ICP has been registered with the Commission as an investment adviser since 2006 and is a wholly-owned subsidiary of ICP Holdco.

13.     **ICP Securities, LLC (ICPS)** is a Delaware corporation headquartered in New York.  ICPS is a registered broker-dealer and a member firm of the Financial Industry Regulatory Authority ("FINRA").  ICPS engages in the structuring, origination, trading, and distribution of leveraged credit instruments and primarily conducts riskless principal transactions.  ICPS is a wholly-owned subsidiary of ICP Holdco.

14.     **Institutional Credit Partners, LLC (ICP Holdco)**, a/k/a or d/b/a ICP LLC or ICP Capital LLC, is a Delaware corporation headquartered in New York.  ICP Holdco is majority-owned by Defendant Priore (through an entity he wholly owns, Founders, LLC) and is the owner of ICP and ICPS.  In addition, ICP Holdco is the sole owner of several other ICP affiliates:  (a) ICP Strategic Credit Income GP, LLC; (b) ICP (Capital) London LLP, a broker-dealer registered with the United Kingdom's Financial Services Authority; and (c) ICP Consulting, LLC, a firm that provides portfolio analytic services.

15.     **Thomas C. Priore**, age 41, resides in Chappaqua, New York.  Priore is the founder, president, and chief investment officer of ICP and a 76% owner of ICP Holdco (through Founders, LLC).  Priore serves as ICPS's president and is registered with FINRA as ICPS's general securities principal and general securities representative.

<u>**OTHER RELEVANT ENTITIES AND INDIVIDUALS**</u>

16.     **The Portfolio Manager** resides in New York, New York.  Until earlier this year, Portfolio Manager was a senior officer of ICP who reported directly to Priore.

17.     **The Managed Account** is an investment account for which ICP served as investment adviser since 2007 and over which it exercised discretionary trading authority.  The Managed Account was beneficially owned by an important client of ICP and Priore ("Client A").

## FACTUAL BACKGROUND

18.     ICP served as the collateral manager to four collateralized debt obligations known as the Triaxx CDOs:  Triaxx Prime CDO 2006-1, Ltd. ("Triaxx 1"); Triaxx Prime CDO 2006-2, Ltd. ("Triaxx 2"); Triaxx Prime CDO 2007-1, Ltd. ("Triaxx 3"); and Triaxx Funding High Grade I, Ltd. ("Triaxx Funding").  The Triaxx CDOs, which were launched in 2006 and 2007, were pooled investment vehicles that issued notes and other debt obligations to investors to raise funds to invest in residential mortgage-backed bonds.  Each of the CDOs was an entirely separate entity with distinct investors.  Triaxx 1, 2, and 3 were what are typically referred to in the structured finance industry as "cash-flow" CDOs, while Triaxx Funding was a "market-value" CDO.[1]  Collectively, the Triaxx CDOs issued more than $11 billion of notes and other obligations.

19.     Like other CDOs, the Triaxx CDOs were structured so that investors who owned notes with a higher credit rating and a higher priority of repayment received a lower interest rate. The CDOs' debt notes were issued in several classes (or "tranches"), with each tranche having a different seniority in the priority of repayment and a different rate of interest payment.  The CDOs' residual or equity interests, which were last in the priority of repayment, did not receive a fixed rate of return but instead were entitled to receive any assets or interest that may remain after the CDOs' obligations were satisfied and their notes were repaid.

---

[1]      The most relevant distinction between cash-flow and market-value CDOs is in the effect of changes in the market value of the portfolio of bonds or other assets held by the CDO.  In cash-flow CDOs, a change in the market value of this investment portfolio usually does not require any of the assets to be sold.  Under the financing arrangements typically employed by market-value CDOs, however, the CDOs are subject to margin calls whenever the market value of their assets declines.  To meet such margin calls, a market-value CDO is required to sell assets and, if it cannot do so at sufficiently high prices, liquidate its investment portfolio to satisfy obligations to senior lenders or investors.

20.     Unlike many other CDOs, the Triaxx CDOs did not sell equity interests to third-party investors.  Instead, ICP structured each of the three cash-flow CDOs — Triaxx 1, 2, and 3 — so that, in addition to a collateral management fee, ICP would earn an "incentive fee" equal to 100 percent of the cash flow that remained after the CDOs' other obligations were paid.  In effect, therefore, ICP held the residual or equity interest in each of the Triaxx cash-flow CDOs, without having contributed any cash or assets.  Similarly, the equity interest in Triaxx Funding was held by a hedge fund managed by ICP, in which Defendants ICP Holdco and Priore held ownership interests.  As the effective equity holders in the Triaxx CDOs, ICP, Priore, and ICP Holdco had the incentive to enhance the CDOs' risk in the hope of reaping the potential returns (since losses would be borne by the other investors while any profits in excess of what was owed to those investors would be retained by the Defendants).

21.     In addition to managing billions of dollars in the Triaxx CDOs, ICP and Priore served as investment advisers to several hedge funds, the largest of which was known as the ICP Strategic Credit Income Fund ("SCIF").  ICP touted SCIF as a multi-strategy, fixed income, absolute-return fund.  In addition, ICP served as investment adviser with discretionary trading authority for the Managed Account, with Priore serving as its portfolio manager.  Under an investment management agreement, ICP had the authority to manage the Managed Account's assets without the need to obtain Client A's prior consent, and was entitled to receive certain of the net profits generated by the Managed Account.

22.     To govern its conduct in managing the Triaxx CDOs, ICP entered into investment advisory agreements known as "collateral management agreements," which Priore signed on behalf of ICP.  These agreements placed various restrictions on ICP's authority to act on behalf of the CDOs.  For example, the agreements obligated ICP at all times to "exercise reasonable

care, using a degree of skill and attention no less than that which [ICP] exercises with respect to comparable assets that it manages for itself, and in a commercially reasonable manner consistent with practices and procedures followed by institutional managers of national standing . . . ." In addition, ICP was required strictly to follow all of the terms set forth in the CDOs' indentures, which were the documents governing the CDOs' obligations to their investors.

23.     To further protect the Triaxx CDOs and their investors from improper transactions, ICP was required under the terms of the collateral management agreements to conduct all trades on behalf of the CDOs on an "arm's length" basis — i.e., on terms at which unaffiliated parties would freely agree to trade. In setting prices for trades, ICP also was required to seek "best execution," which meant that ICP had to use reasonable diligence to ascertain the best market and to purchase or sell securities at prices that were as favorable as possible to the CDOs. Finally, if ICP sought to sell a security held by a Triaxx CDO, it was prohibited from bidding on that security for the account of any other client of ICP (including another CDO) unless ICP first obtained "*bona fide* bids" on that security "from at least two other nationally recognized independent dealers." These various restrictions were designed to prevent ICP from directing trades on terms that were unfavorable to the CDOs.

24.     ICP was also required to follow certain investment guidelines for the Triaxx CDOs. Among other things, the guidelines prohibited ICP from causing either Triaxx 1, 2, or 3 from "hold[ing] itself out as being willing to enter into . . . or to offer to enter into . . . [or] assume" any "forward contract" (i.e., an agreement to buy or sell an asset, at a pre-determined price, on a specified date in the future). Because forward contracts could substantially increase the investment risk faced by the CDOs, thereby exposing investors to potentially serious losses

in a down market, ICP was expressly forbidden by the collateral management agreements from entering into them.

25.     The CDOs' indentures placed other restrictions on ICP's authority.  The CDOs received monthly payments (known as "amortization") as the mortgages backing the bonds held by the CDOs were refinanced, redeemed, or paid down.  Although the CDOs were permitted in certain circumstances to reinvest such amortization in additional securities, they could do so only if ICP first obtained independent approval for each reinvestment.  Specifically, the indentures provided that neither Triaxx 1, 2, nor 3 could purchase securities "without the prior written approval of such investment" by the parties that provided insurance on the CDOs' senior debt notes.  For Triaxx 1 and 2, this party was AIG Financial Products Corporation ("AIG"), and for Triaxx 3, it was Financial Guaranty Insurance Company ("FGIC").  In addition, ICP was not permitted to reinvest in additional securities unless the proposed trade satisfied detailed investment criteria designed to ensure diversification of the CDOs' overall portfolio and to preclude investment in risky or poor quality assets.

26.     Finally, to ensure that all trading activity on behalf of the CDOs conformed to these and other criteria, ICP was required to make certifications to a third-party trustee that acted on behalf of the Triaxx CDOs and their investors.  Before the trustee would accept trades for the CDOs, ICP had to certify by its signature on each trade ticket that a given trade complied with all of the investment criteria set forth in the CDOs' indentures, including the obligations to trade on an arms' length basis, consistent with ICP's best execution obligation, and with the consent of AIG or FGIC.  When the CDOs were created, ICP "directed [the trustee] to rely" on its future representations that each trade was in compliance with such requirements.

27.     As collateral and investment managers, ICP and Priore were fiduciaries to the Triaxx CDOs, SCIF, and the Managed Account, and owed to each a duty to act in its best interests. Notwithstanding their obligations, however, ICP and the other Defendants engaged in a multitude of transactions that defrauded ICP's clients out of many millions of dollars. Many of these transactions were done to favor one set of ICP clients — Triaxx Funding or the Managed Account — over ICP's other clients, the three Triaxx cash-flow CDOs. Other transactions were made in order to line the pockets of ICP and its affiliates. As described more fully below, the Defendants' misconduct included the following:

a.     Committing the Triaxx CDOs, without obtaining required approvals from AIG or FGIC and in violation of the CDOs' indentures, to forward-purchase a $1.3 billion portfolio of mortgage-backed bonds, and concealing this investment from the CDOs' trustee;

b.     Fraudulently rearranging the purchase of the $1.3 billion portfolio to misappropriate an undisclosed $14 million profit for ICP and its affiliates at the Triaxx CDOs' expense;

c.     Committing the Triaxx CDOs to forward-purchase from the Managed Account numerous bonds at back-dated prices instead of the lower prevailing market prices;

d.     Selling bonds from Triaxx Funding to the other Triaxx CDOs at artificially-inflated prices so that Triaxx Funding could satisfy its margin obligations to one of its creditors at the expense of the other Triaxx CDOs;

e.     Using SCIF's assets to make undisclosed cash transfers to meet Triaxx Funding's margin obligations, repeatedly misrepresenting the transfers as collateralized loans, and causing their value to be misreported on SCIF's books;

f.     Directing fraudulent and manipulative "rebalancing" cross-trades of bonds between the CDOs, at above-market prices, in order to: (i) facilitate the CDOs' improper

purchases of bonds from Triaxx Funding and the Managed Account; and (ii) manipulate the CDOs' overcollateralization and other tests to generate millions of dollars in fees for ICP;

g.    Purchasing bonds in the open market and then selling those bonds, often on the same day, to the Triaxx CDOs at higher prices, thereby generating undisclosed riskless profits at the CDOs' expense;

h.    Improperly "swapping" bonds that were forward-purchased by the Triaxx CDOs with cheaper securities and selling those cheaper securities to the CDOs at the forward-purchase price of the original bonds, while retaining the undisclosed price spread for the benefit of ICP and another client;

i.    Purchasing numerous bonds for the Triaxx CDOs without obtaining the prior written consent of AIG or FGIC;

j.    Misrepresenting to the CDOs' trustee that trades that ICP executed for the CDOs conformed in all respects to the CDOs' investment eligibility criteria, when in fact such trades violated multiple criteria; and

k.    Misrepresenting and concealing information concerning their improper trading activity in communications with investors in the Triaxx CDOs.

## THE DEFENDANTS' ILLEGAL CONDUCT

### A.    The First Prohibited Forward-Purchase Arrangement

28.    In early June 2007, as a result of the collapse of certain hedge funds under its management, the Wall Street firm of Bear Stearns put up for auction a large quantity of mortgage-backed bonds that previously had been held by its hedge funds. Priore participated in the auction and placed a winning bid for approximately $1.3 billion of bonds. Since no ICP entity or client account had sufficient cash available to immediately acquire all of the bonds, ICP

arranged for two other major brokerage firms and SCIF, the hedge fund ICP managed, to accept immediate delivery of the bonds. The brokerage firms agreed to hold a total of approximately $1 billion in bonds and SCIF was allocated approximately $300 million.

29.     Under a temporary financing arrangement, the two brokerage firms agreed to purchase the bonds and simultaneously forward-sell them to the Triaxx CDOs. On or around June 14, 2007, ICP committed Triaxx 1, 2, and 3 to forward purchase the Bear Stearns bonds from the brokerage firms. These trades were memorialized in writing. The settlement dates — i.e., the dates when the CDOs would deliver payment and receive the bonds — were set for August and September 2007.

30.     In entering into this forward-purchase agreement, ICP violated its duties to the CDOs in numerous ways. First, ICP and Priore violated the express prohibition against forward contracts in the CDOs' investment guidelines. Second, ICP committed the CDOs to this arrangement without consulting with, or obtaining the consent of, AIG or FGIC. Third, ICP failed to inform the CDOs' trustee, as it was required to do, of the CDOs' commitment to forward-purchase the bonds, knowing that as a result the trustee's reports to investors would materially misrepresent the CDOs' true investment risk.

**B.     Rearranging the Forward-Purchase Transaction to
        Misappropriate $14 Million for ICP and its Affiliates**

31.     In late June 2007, after having committed the CDOs to the forward purchase of the Bear Stearns bonds from the two brokerage firms, Priore fraudulently altered the transaction to misappropriate approximately $14 million for ICP and its affiliates. Approximately two weeks after the CDOs forward-purchased the bonds (but prior to the settlement dates), Priore arranged to sell the bonds to another ICP client, the Managed Account, at substantially higher

prices. This trade would have allowed the CDOs to realize a profit of approximately $14 million for the risk to which they were exposed on their investment in the Bear Stearns bonds.

32.    Rather than executing this trade on behalf of the CDOs, however, Priore contrived to misappropriate the entire profit for ICP and himself. Under his direction, ICP asked the two brokerage firms to cancel the trades by which they sold the Bear Stearns bonds to the CDOs and book new trades that listed ICP entities — ICP, ICPS, and/or ICP Holdco — as the purchasers of these bonds. Once this was done, the ICP entities simultaneously purchased the bonds from the brokerage firms and resold them at the higher prices to the Managed Account, thereby misappropriating for themselves a risk-free profit of approximately $14 million.

33.    By replacing the CDOs with the ICP entities as the purchasers of the bonds, ICP and Priore defrauded the CDOs of a profit that rightfully belonged to them. If the trade had been done properly, the CDOs would have sold the bonds to the Managed Account and retained the $14 million profit. Moreover, by placing the CDOs at risk of loss on the original trade (by obligating them to purchase the bonds from the brokerage firms at fixed prices even if the market prices of the bonds declined in the future) but depriving them of the opportunity for gain (by seizing for ICP and its affiliates any gains from the sale of the bonds at improved prices), ICP and Priore exploited the CDOs' creditworthiness for their own gain.

34.    Although each of the Triaxx CDOs had a board of independent directors, ICP made no disclosure of this transaction to the CDOs or their boards of directors. Nor was the $14 million markup disclosed to Client A.

**C.    The Second Improper Forward-Purchase Arrangement**

35.    When Priore sold the $1.3 billion portfolio of Bear Stearns bonds to the Managed Account in June 2007, he represented to Client A that he had CDOs with "locked up money" that could acquire the bonds from the Managed Account on a regular basis. At the time, however,

Priore viewed this as only one of several options that ICP could utilize in managing the Managed Account's portfolio, and he did not firmly commit the CDOs to forward-purchase the bonds from the Managed Account.

36.      It was not until August 2007 — when Client A voiced concerns about the decline in the mortgage markets — that Priore determined to forward sell the entire portfolio of Bear Stearns bonds to the Triaxx CDOs at defined prices.  Priore did so, once again, in violation of the prohibition on forward contracts, and without obtaining the approval of AIG or FGIC or disclosing the transaction to the CDOs' trustee.  Moreover, rather than using the prevailing market prices of the bonds in August 2007, Priore used the higher prices at which the Managed Account had acquired them in June 2007, before the market deteriorated.  By effectively "back-dating" the forward-purchase prices, ICP and Priore improperly committed the CDOs to overpay for the bonds.  In the end, as a result of this prohibited and concealed arrangement, the Triaxx CDOs overpaid for bonds purchased from the Managed Account by at least $50 million.

37.      At the same time that they violated their fiduciary duties to the Triaxx CDOs in connection with this second improper forward-purchase agreement, ICP and Priore violated important duties of disclosure owed to Client A.  In communications with Client A concerning this agreement, Priore failed to disclose that ICP lacked authority to enter into forward contracts on behalf of the CDOs and that he had not obtained the required approval of AIG or FGIC.  Nor did Priore tell Client A that ICP had not disclosed the forward-purchase agreement to the CDOs' trustee or that the CDOs' ability to acquire the bonds from the Managed Account depended on many unfulfilled contingencies and conditions, such as satisfaction of numerous investment eligibility requirements and the CDOs' continued ability, under their indentures, to reinvest the proceeds of amortization in new securities.

38.     When he finalized the forward-purchase arrangement in August 2007, Priore delivered a schedule to Client A that contained a list of the bonds to be sold to each of Triaxx 1, 2, and 3, the prices and quantities of each bond, and projected dates, between October 2007 and April 2008, for each CDO to purchase its allotted bonds.  Afterwards, as the market for mortgage-backed securities continued to decline in late 2007 and 2008, ICP simultaneously managed the portfolios of Client A and the Triaxx CDOs, executing transactions between these client accounts at its own discretion.  In doing so, ICP often caused further harm to the CDOs by entirely ignoring the August 2007 schedule.  For example, when one Triaxx CDO was unable to make a scheduled purchase, Priore very often caused another CDO to purchase the bond at the originally-scheduled price.  He did this repeatedly even though the market price of the bond had fallen to much less than the scheduled price, and notwithstanding the fact that the other CDO had no obligation to purchase the bond at the scheduled price and could have purchased the same bond or a similar one for a lower price in the open market.  In this way, ICP improperly treated separate investment vehicles (with distinct investors) as if they were a single portfolio, and caused one CDO to bear the loss on a trade that ICP committed another CDO to make.

39.     Priore also caused the Triaxx CDOs to purchase from the Managed Account, again using "back-dated" mid-2007 prices, bonds that were not forward purchased by the CDOs until much later.  When Priore emailed Client A in late August 2007, he noted that the forward-purchase agreement between the Managed Account and the CDOs did not extend to several bonds in the Managed Account's portfolio, including certain BAFC 2007 and RALI 2007 bonds. For these, Priore noted, "price has not been locked" and the schedule attached to Priore's email listed them as "Hold" positions (i.e., positions that were not being sold to the CDOs).  The forward-purchase of the BAFC and RALI bonds by the Triaxx CDOs was first memorialized in

December 2007.  Nonetheless, Priore once again "back-dated" the pricing.  In mid-2008, after Priore described these bonds as "drastically underperform[ing]," he caused Triaxx 3 to acquire approximately $31 million worth of these bonds at mid-2007 prices of $99.91 and $99.73 per bond.  In purchasing the bonds at these prices, Triaxx 3 overpaid by approximately $3.5 million.

40.     By late 2008, approximately half of the Managed Account's portfolio had been sold to the CDOs at June 2007 forward-purchase prices.  The remainder of the portfolio was liquidated on the open market at a loss of over $200 million to Client A.

**D.     Undisclosed $2.5 Million Profit On Same-Day Sale of Bonds to a Triaxx CDO**

41.     ICP also knowingly directed a purchase by the CDOs through another client account to circumvent an express restriction in the Triaxx CDOs' indentures.  In August 2008, ICP's Portfolio Manager caused a Triaxx CDO to purchase approximately $22 million of mortgage-backed bonds in the open market at a price of $63.50 per bond, and submitted a trade ticket to the CDO's trustee.  The trustee rejected the trade because the CDO's indenture expressly prohibited the purchase of bonds priced below $75.  This prohibition was designed, among other things, to protect the CDO and its investors by ensuring that ICP did not expose them to the risks of owning highly-distressed bonds.

42.     After conferring with Priore, the Portfolio Manager instead caused the Managed Account to acquire the bonds at their prevailing market price of $63.50 per bond and immediately caused Triaxx 2 to purchase the bonds from the Managed Account at a price of $75 per bond.  This grossly-mispriced transaction generated for the Managed Account an immediate, risk-free profit of approximately $2.5 million, directly at the expense of Triaxx 2, and fraudulently evaded an express prohibition in Triaxx 2's indenture.  ICP and Priore made no disclosure of this to any of their clients or the investors in Triaxx 2.

**E.      Fraudulent "Swaps" of Bonds to "Make Some Dough"**

43.      Beginning in early 2008, Priore and others at ICP directed multiple "swaps" of bonds in the Managed Account to generate profits at the expense of the Triaxx CDOs and to evade the approval procedure set forth in the CDOs' indentures.  These swaps were designed to remove bonds from the Managed Account that AIG would not approve for purchase into Triaxx 1 and 2, and replace them with bonds that ICP could argue were approved (because AIG purportedly had approved purchases of such bonds in the past).

44.      The swaps consisted of three steps:  (a) selling bonds from the Managed Account to the open market, even though ICP had committed a Triaxx CDO to forward-purchase those bonds in the summer of 2007; (b) purchasing from the open market into the Managed Account new bonds that were priced below the original bonds; and (c) causing the Triaxx CDO to purchase the new, cheaper bonds from the Managed Account at the forward-purchase price assigned to the original bonds.

45.      As an example of one swap, the Managed Account held several millions of dollars worth of DBALT 2005 bonds, which a Triaxx CDO committed in August 2007 to forward-purchase for $99.22 per bond.  The improper swap was executed as follows:

a.      In June 2008, ICP and Priore caused the Managed Account to sell approximately $38 million of the DBALT 2005 bonds in the open market at $81.56 per bond (the prevailing price at the time);

b.      At the same time, ICP and Priore caused the Managed Account to purchase approximately $38 million of CMALT 2007 bonds at $78.63 per bond from ICPS, which had just purchased those bonds in the open market; and

c.     Next, ICP and Priore caused a Triaxx CDO to purchase from the Managed Account several million dollars worth of CMALT 2007 bonds at the forward-purchase price of the original DBALT 2005 bonds (i.e., $99.22 per bond) just days after ICPS purchased the CMALT 2007 bonds in the open market at $78.63 per bond.

46.     ICP and Priore structured some of the swaps so that ICPS could generate an additional risk-free profit at the expense of the CDOs.  Indeed, in one email, Priore wrote that he was doing the swaps so that he could "make some dough" for ICP.  For example, in mid-2008, ICPS acquired approximately $26 million dollars worth of CMALT 2006 bonds in the open market at a price of $81.13 per bond and immediately sold them to the Managed Account at a price of $82.63 per bond (generating a risk-free profit of approximately $400,000 for ICPS).  Shortly afterwards, ICP caused the Managed Account to sell the bonds to Triaxx 1 at a forward-purchase price of $97.84 per bond — a price that had been assigned to a different bond approximately 12 months earlier.

47.     By carrying out these improper swaps, ICP, ICPS, and Priore compounded the Triaxx CDOs' losses on purchases from the Managed Account by causing them to pay forward-purchase prices for less valuable bonds.  In addition, the swaps caused the CDOs to acquire bonds, using inflated June 2007 prices, that the CDOs had never committed to forward purchase. If ICP and Priore wanted the CDOs to acquire the cheaper bonds, they could have made such purchases directly into the CDOs from the open market at prevailing market prices.  Instead, they executed the swaps to generate profits at the CDOs' expense.

**F.     Fraudulent Sales to Save Triaxx Funding**

48.     As the mortgage markets began to sharply decline in late 2007, Triaxx Funding received numerous margin calls from the counterparty to its repurchase financing agreement ("Repo Counterparty").  Under the repurchase agreement, the Repo Counterparty regularly

marked-to-market the value of Triaxx Funding's portfolio of mortgage bonds and, as the value dropped, demanded that Triaxx Funding post additional capital (referred to as "margin") to protect against potential losses.  If Triaxx Funding failed to do so, the Repo Counterparty had the right to seize the CDO's bonds and sell them to satisfy Triaxx Funding's obligations under the repurchase agreement.

49.     To allow Triaxx Funding to raise cash to meet the margin calls, ICP and Priore caused Triaxx 1, 2, and 3 to purchase hundreds of millions of dollars in bonds from Triaxx Funding at what they knew were above-market prices.  Triaxx 1, 2, and 3 thereby overpaid for bonds by approximately $38 million.  In addition to improperly favoring Triaxx Funding over the other CDOs, these sales violated ICP's obligations to obtain best execution for all purchases by Triaxx 1, 2, and 3 and to conduct all transactions on an arms' length basis.

50.     Between March and October 2008, ICP caused Triaxx Funding to sell nineteen bonds — each one to another Triaxx CDO, and not once in the open market.  For example, at Priore's direction, Triaxx 3 purchased CMALT 2007-A6 1A1 bonds from Triaxx Funding on July 28, 2008 at a price of $92 per bond, even though ICP knew that the prevailing market price for these bonds was substantially lower.  (ICP had purchased a very similar bond, CMALT 2007-A5 1A3, on the open market two weeks earlier at a price of $78.63 per bond.)  ICP submitted to the CDOs' trustee trade tickets for each of the sales from Triaxx Funding to the other CDOs that falsely represented that such sales complied with the CDOs' investment eligibility criteria in all respects.

51.     Priore knew that the prices of sales from Triaxx Funding were substantially above prevailing market levels, yet instructed ICP employees to proceed with the sales.  After several sales were executed, ICP's Portfolio Manager, who felt uncomfortable following Priore's instructions, directed ICP employees to name Priore as the trader in ICP's books and records.

### G.  Misrepresented Transfers from SCIF to Triaxx Funding

52.     In late 2008, after AIG complained about unauthorized trades, ICP was compelled to stop nearly all reinvestments by the Triaxx CDOs.  Among other things, this meant that ICP no longer could cause Triaxx 1 or 2 to purchase bonds from Triaxx Funding at inflated prices so that the latter could meet its margin calls.  Nor could ICP sell bonds from Triaxx Funding in the open market to meet its margin obligations because ICP knew that market prices were so depressed that such sales would not raise enough cash.  To keep Triaxx Funding afloat — and protect ICP's reputation and future fee stream — ICP caused SCIF, the largest hedge fund it managed, to make several multi-million-dollar payments to the Repo Counterparty to meet Triaxx Funding's margin calls.  Priore did not inform SCIF's investors of these payments or seek their approval, and repeatedly misrepresented the nature of the payments to the hedge fund's administrator.

53.     In late October 2008, the Repo Counterparty issued a margin call of approximately $7.2 million to Triaxx Funding.  At Priore's direction, the Portfolio Manager caused SCIF to make a payment of $7.2 million directly to the Repo Counterparty.  ICP initially planned to execute a side letter between SCIF and the Repo Counterparty providing for repayment to SCIF, but the Repo Counterparty declined to sign such an agreement.  In the following months, ICP caused SCIF to make nine additional cash transfers to the Repo Counterparty for a total of approximately $36.5 million — even though neither the Repo Counterparty nor Triaxx Funding ever agreed to repay SCIF.

54.     ICP and Priore repeatedly misrepresented the nature of the cash transfers to SCIF's administrator, causing the administrator to materially misrepresent SCIF's holdings.  In December 2008, ICP sent a letter to the administrator that falsely described the first cash transfer as a "Collateralized Loan" with a term of "1 month (Option to Roll)" and an "End Date" of

November 28, 2008.  The letter also falsely asserted that the transfer "represents ownership in Triaxx Funding CDO."  All of these characterizations were false, as Priore knew.  In January 2009, Priore signed another letter, again describing a SCIF cash transfer to the Repo Counterparty as a "Collateralized Loan," this time with an "Open Term" and no "End Date."  ICP also misrepresented to the hedge fund's administrator that the "use of proceeds . . . of each Loan is solely to meet the margin payment obligations of [Triaxx Funding]."  In truth, ICP caused SCIF to make cash transfers even when no margin call was outstanding so that Triaxx Funding could meet its quarterly payment obligations for administrative expenses, legal fees, and interest payments to investors.

55.     By referring to the payments as "collateralized loans," ICP and Priore falsely implied that there were defined means of repayment or assets that SCIF could look to if it were not repaid.  None of that was true.  ICP and Priore knew that no party had agreed to repay the funds, that no interest rate was being earned on the amounts advanced, and that there was no term or maturity date associated with the cash transfers.  Even after being advised in writing by counsel that it was uncertain whether SCIF could ever be repaid, ICP continued to account for all cash transfers on SCIF's books at full value as if repayment with interest were guaranteed.  When an ICP employee raised questions about the "loans" and SCIF's repayment prospects, Priore concealed the truth from him as well.  He wrote to the employee that an explanation for the "loans" was "imbedded in the Triaxx document itself as to how the transaction operates."  In truth, neither Triaxx Funding's indenture nor any other document contemplated repayment to SCIF.

56.     Triaxx Funding collapsed in early 2010 after failing to meet a margin call.  The Repo Counterparty auctioned the CDO's portfolio at prices ranging from $41 to $69 per bond,

which left SCIF with no prospect of repayment of the purported "collateralized loans." In addition, SCIF lost approximately $119 million on notes it held in Triaxx Funding.

## H.    Cross-Trades at Artificially-Inflated Prices

57.    Beginning in the fall of 2007, ICP began executing dozens of cross-trades among Triaxx 1, 2, and 3 at what Priore and others at ICP knew were inflated prices. Within ICP, this process was referred to as "rebalancing."

58.    One of the reasons for these "rebalancing" trades was to generate cash in a CDO so that it could purchase bonds at artificially-inflated prices from Triaxx Funding. For example, on April 28, 2008, an ICP employee wrote: "we cannot put the bonds from TF [Triaxx Funding] into T2 [Triaxx 2] because they are not eligible . . . . We need to put them into T3 [Triaxx 3] and then move . . . eligible bonds from T3 out [into Triaxx 2]." On other occasions, cross-trades were done to generate cash for the purpose of purchasing bonds from the Managed Account at above-market prices.

59.    The cross-trades between Triaxx 1, 2, and 3 violated ICP's obligations to obtain best execution on all trades and to conduct transactions on behalf of the CDOs on an arms' length basis, in a commercially reasonable manner, and, in the case of cross-trades, only after bona fide bids had been received from third parties. The prices at which the cross-trades were done often vastly exceeded the market prices of the bonds, as Priore knew. For example, on April 30, 2008, ICP caused the CDOs to cross-trade tens of millions of dollars worth of WFMBS 2007 bonds at a price of $99.20 per bond, even though ICP acquired the same bonds on the same day from an unaffiliated dealer at $85.16 per bond. On another occasion, ICP caused the CDOs to cross-trade millions of dollars worth of CMALT 2007 bonds several times at prices ranging from $78 to $99.86 per bond. In both instances, ICP employees were aware that the market price for the bonds was somewhere in the $70s or $80s per bond and not anywhere near par. In yet

another instance, after a Triaxx CDO purchased bonds from Triaxx Funding at the price of $92 per bond, ICP caused the CDO to sell the same bonds to another Triaxx CDO, on the same day, at a price of approximately $96 per bond. Each time ICP submitted a trade ticket for a cross-trade between the Triaxx CDOs, it represented to the CDOs' trustee that the trade complied with the vehicles' investment eligibility criteria. Those representations were false.

60. Many of the cross-trades between Triaxx 1, 2, and 3 were done, with Priore's knowledge, at a price of $92 or above per bond to manipulate the CDOs' "overcollateralization" test. Like other CDOs, the Triaxx vehicles had to satisfy several tests each month before they could reinvest income and pay ICP's fees. Among those was the overcollateralization test, which measures the protection afforded investors by the overall value of collateral bonds. In computing overcollateralization, the Triaxx CDOs' indentures permitted a bond's value to be considered at par (i.e., $100) if the bond was purchased at $92 or above. The "rebalancing" cross-trades usually were done at or above that threshold, and the extra overcollateralization credit that these trades generated caused the Triaxx CDOs to continue their reinvestment period for months after it should have ceased. As a result, ICP earned tens of millions of dollars in advisory fees that it otherwise would not have received and to which it was not entitled.

## I. Repeated Investments Without Required Approvals and Misrepresentations to Investors

61. As described above, ICP had to obtain prior written consent from AIG or FGIC for all investments on behalf of the Triaxx CDOs — a procedure that served as an independent check on ICP's management of the vehicles. The requirement of a trade-by-trade approval by independent parties was touted by ICP in marketing the notes issued by the CDOs. In promotional materials to investors, ICP referred to AIG as a "collateral manager" that would provide "ongoing approval on collateral." The offering circulars of Triaxx 1 and 2 similarly

represented to investors that the CDOs "may not purchase any Collateral Debt Securities without the prior written approval of" AIG. Notwithstanding these representations, ICP and Priore repeatedly caused the Triaxx CDOs to invest in bonds without obtaining any approvals.

62. Unapproved purchases began as early as April 2007. Short after, in the summer of 2007, ICP and Priore caused the Triaxx CDOs to forward purchase the $1.3 billion Bear Stearns portfolio of bonds, a massive investment for which ICP and Priore did not seek any approval and which they concealed from the CDOs' trustee.

63. In October 2007, an ICP employee sought after-the-fact approval for bonds that had been purchased (without approval) from the Managed Account the month before. The employee represented to AIG that the "current market allows us to buy these securities at significant discounts." ICP did not mention that the price of the bonds had in fact been fixed in the summer of 2007 and was therefore not reflective of the "current market." ICP also failed to disclose that the acquisition of the bonds was not driven by "significant discounts" but rather by a concealed and prohibited forward-purchase agreement. After AIG rejected the bonds, ICP kept them in the Triaxx CDO anyway. When AIG later learned of this and complained, the Portfolio Manager blamed an "operational oversight" and promised to remove the bonds. Instead, ICP left the unapproved bonds in the CDO for months and continued to purchase other unapproved investments.

64. In December 2007, ICP admitted to AIG that it had made additional unapproved purchases and promised to reverse such trades. For one purchase, an ICP employee again sought after-the-fact approval by referring to "significant discounts" available in the "current market," and stating that "[w]e are targeting this pool because of sound underwriting and performance." Once again, this was misleading because the bonds were priced at June 2007 levels that did not

reflect "significant discounts" or "current market" levels. Nor was ICP "targeting" the bonds because of "sound underwriting and performance" — ICP had already committed the CDO to this purchase months earlier. AIG again rejected the bonds, and in May 2008 informed Priore that it was "not able to agree to continued reinvestment" in Triaxx 1 and 2 and that "consent will no longer be given for any collateral." Nonetheless, ICP continued to make purchases for both Triaxx 1 and 2.

65.     In the fall of 2008, AIG inquired about additional unauthorized purchases at above-market prices. At Priore's direction, ICP's Portfolio Manager wrote to AIG that "[w]e bought the assets at market prices." As Priore knew, this statement was misleading because ICP made the purchases at prices that far exceeded the market prices prevailing at the time of the trades. In mid-2008, another CDO investor contacted ICP to inquire about trades at inflated prices. Priore and others acting at Priore's direction responded with similarly misleading explanations, informing the investor that such trades were part of ICP's focus on "building OC [overcollateralization] . . . by buying some discount securities, and by buying some earlier vintage securities which trade at a higher dollar price but [which] we believe offer a better credit story." It was not until subsequent communications that ICP acknowledged to the investor that trades were made pursuant to a forward-purchase arrangement. When the investor requested more information, including a copy of any agreement, Priore refused to provide it.

66.     ICP evaded the CDOs' approval procedure in other ways. For example, the CDOs' investment guidelines prohibited the purchase of derivatives. Nevertheless, ICP used ICPS to combine mortgage-backed bonds with ineligible derivatives and then sell the "repackaged" security into a CDO in violation of that restriction and without obtaining any approval. Moreover, in creating the new repackaged security, ICP caused SCIF to earn

substantial undisclosed fees. SCIF acquired and temporarily held the prohibited derivatives shortly before they were sold into the new security (which, in turn, was immediately sold to the Triaxx CDOs). Although it faced virtually no risk in doing so (because ICP had already committed to sell the derivatives from SCIF into the new repackaged security), ICP caused SCIF to retain undisclosed markups of up to 40 percent — substantially above what was appropriate for SCIF's riskless role — and thereby caused the CDOs to overpay for the repackaged security. SCIF's profits at the expense of the CDOs totaled approximately $5 million.

**J.     Failure to Implement Compliance Procedures and to
        Maintain Accurate Books and Records**

67.     In addition to defrauding its clients and investors, ICP failed to implement appropriate compliance policies and procedures and to maintain accurate books and records, as it was required to do under the securities laws. Among other things, ICP's written compliance manual required independent third-party approvals before ICP could execute any trades with ICPS on behalf of its advisory clients. In practice, ICP did not implement or follow this procedure. ICP's compliance manual also required ICP to hold quarterly Brokerage Committee meetings to oversee ICP's compliance with its obligations to obtain best execution for client trades. In practice, no such committee ever met for that purpose.

68.     ICP's written compliance manual also required the prior written disclosure to clients of all material terms of principal trades (i.e., trades between clients, on the one hand, and ICP or its affiliates acting as principals, on the other) and obtaining client consent to such trades. The manual further provided that in a trade in which ICP or its affiliates sold a security to a client, the purchase price paid by ICP or its affiliate for the security was a material term. Nevertheless, ICP did not disclose the original purchase prices that ICP and its affiliates paid for

the $1.3 billion Bear Stearns portfolio of bonds, which they sold to the Managed Account and which they caused the Triaxx CDOs to forward purchase from the Managed Account.

69.     Similarly, in the course of operating its investment advisory business, ICP failed to maintain accurate books and records.  Among other things, it failed to maintain proper memoranda of all orders for the purchase or sale of securities that identify the person who actually recommended each such transaction.  As a result of the fraudulent practices described above, numerous trades in ICP's trade blotter did not accurately reflect the ICP trader who had in fact directed the transaction or the accurate parties to the transaction.

## FIRST CLAIM

**Violations of Section 17(a) of the Securities Act**

(Against all Defendants)

70.     The Commission repeats and realleges Paragraphs 1 through 69 of this Complaint as if fully set forth herein.

71.     As alleged herein, Defendants ICP, ICPS, ICP Holdco, and Priore, directly or indirectly, singly or in concert with others, in the offer and sale of securities, by the use of the means and instruments of transportation and communication in interstate commerce and of the mails, knowingly or recklessly:  (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices or courses of business which operated or operate as a fraud or deceit upon purchasers of securities.

72.     By reason of the foregoing, Defendants ICP, ICPS, ICP Holdco, and Priore violated, and unless enjoined and restrained will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM

### Violations of and Aiding and Abetting Violations
### of Section 10(b) of the Exchange Act and Rule 10b-5

(Against all Defendants)

73.     The Commission repeats and realleges Paragraphs 1 through 69 of this Complaint as if fully set forth herein.

74.     As alleged herein, Defendants ICP, ICPS, ICP Holdco, and Priore, directly or indirectly, singly or in concert, by the use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly:  (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of business which operated and operate as a fraud or deceit upon purchasers of securities and upon other persons.

75.     By reason of the foregoing, Defendants ICP, ICPS, ICP Holdco, and Priore violated, and unless enjoined and restrained will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

76.     As further alleged herein, Defendants ICP, ICPS, ICP Holdco, and Priore knowingly provided substantial assistance to the other Defendants' violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendants ICP, ICPS, ICP Holdco, and Priore aided and abetted, and unless enjoined and restrained will continue to aid and abet, violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

# THIRD CLAIM

## Violations of and Aiding and Abetting Violations of
## Section 15(c)(1)(A) of the Exchange Act and Rule 10b-3

### (Against ICPS, ICP, and Priore)

77. The Commission repeats and realleges Paragraphs 1 through 69 of this Complaint as if fully set forth herein.

78. At all relevant times, Defendant ICPS was a registered broker dealer pursuant to Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)].

79. As alleged herein, Defendant ICPS, directly or indirectly, by the use of the means or instrumentality of interstate commerce, of the mails, or of any facility of any national securities exchange, used or employed, in connection with the purchase or sale, or the inducement or attempted inducement of the purchase or sale, of securities otherwise than on a national securities exchange, acts, practices, or courses of business that constitute a manipulative, deceptive, or other fraudulent device or contrivance.

80. By reason of the foregoing, Defendant ICPS violated, and unless enjoined and restrained will continue to violate, Section 15(c)(1)(A) of the Exchange Act [15 U.S.C. § 78o(c)(1)(A)] and Rule 10b-3 thereunder [17 C.F.R. 240.10b-3].

81. As further alleged herein, Defendants ICP and Priore knowingly provided substantial assistance to ICPS's violations of Section 15(c)(1)(A) of the Exchange Act and Rule 10b-3 thereunder. Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendants ICP and Priore aided and abetted, and unless enjoined and restrained will continue to aid and abet, violations of Section 15(c)(1)(A) of the Exchange Act [15 U.S.C. § 78o(c)(1)(A)] and Rule 10b-3 thereunder [17 C.F.R. 240.10b-3].

## FOURTH CLAIM

### Violations of and Aiding and Abetting Violations
### of Sections 206(1) and 206(2) of the Advisers Act

#### (Against all Defendants)

82.     The Commission repeats and realleges Paragraphs 1 through 69 of this Complaint as if fully set forth herein.

83.     At all relevant times, Defendants ICP and Priore operated as investment advisers as defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)], and served in that capacity with respect to their clients and investors.

84.     As alleged herein, Defendants ICP and Priore, while acting as investment advisers, directly or indirectly, by the use of the mails or means and instrumentalities of interstate commerce:  (a) with requisite scienter, employed devices, schemes, and artifices to defraud clients and prospective clients; and (b) engaged in transactions, practices, and courses of business which operated and operate as a fraud or deceit upon clients and prospective clients.

85.     By reason of the foregoing, Defendants ICP and Priore violated, and unless enjoined and restrained will continue to violate, Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1)-(2)].

86.     As further alleged herein, Defendants ICPS, ICP Holdco, and Priore knowingly provided substantial assistance to ICP's violations of Sections 206(1) and 206(2) of the Advisers Act.  By reason of the foregoing, Defendants ICPS, ICP Holdco, and Priore aided and abetted, and unless enjoined and restrained will continue to aid and abet, violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1)-(2)].

## FIFTH CLAIM

### Violations of and Aiding and Abetting Violations
### of Section 206(4) of the Advisers Act and Rule 206(4)-8

(Against all Defendants)

87.     The Commission repeats and realleges Paragraphs 1 through 69 of this Complaint as if fully set forth herein.

88.     At all relevant times, Defendants ICP and Priore operated as investment advisers as defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)], and served in that capacity with respect to their clients and investors.

89.     As alleged herein, Defendants ICP and Priore, while acting as investment advisers to pooled investment vehicles, have made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to investors or prospective investors, or otherwise engaged in acts, practices, or courses of business that are fraudulent, deceptive, or manipulative with respect to investors or prospective investor.

90.     By reason of the foregoing, Defendants ICP and Priore violated, and unless enjoined and restrained will continue to violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. 275.206(4)-8].

91.     As further alleged herein, Defendants ICPS, ICP Holdco, and Priore knowingly provided substantial assistance to ICP's violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.  By reason of the foregoing, Defendants ICPS, ICP Holdco, and Priore aided and abetted, and unless enjoined and restrained will continue to aid and abet, violations of Sections 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. 275.206(4)-8].

## SIXTH CLAIM

### Violations of and Aiding and Abetting
### Violations of Section 206(3) of the Advisers Act

(Against ICP and Priore)

92.     The Commission repeats and realleges Paragraphs 1 through 69 of this Complaint as if fully set forth herein.

93.     At all relevant times, Defendants ICP and Priore operated as investment advisers as defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)], and served in that capacity with respect to their clients and investors.

94.     As alleged herein, Defendants ICP and Priore, while acting as principal for their own account, knowingly sold securities to or purchased securities from a client, or while acting as broker for a person other than such client, knowingly effected a sale or purchase of securities for the account of such client, without first disclosing to such client in writing, before the completion of such transaction, the capacity in which they were acting and obtaining the consent of the client to each such transaction.  Defendants ICP and Priore did so both directly, indirectly, and/or through or by another person [15 U.S.C. § 80b-8(d)].

95.     By reason of the foregoing, Defendants ICP and Priore violated, and unless enjoined and restrained will continue to violate, Section 206(3) of the Advisers Act [15 U.S.C. § 80b-6(3)].

96.     As further alleged herein, Defendant Priore knowingly provided substantial assistance to ICP's violations of Section 206(3) of the Advisers Act.  By reason of the foregoing, Defendant Priore aided and abetted, and unless enjoined and restrained will continue to aid and abet, violations of Section 206(3) of the Advisers Act [15 U.S.C. § 80b-6(3)].

## SEVENTH CLAIM

### Violations of Section 204 of
### the Advisers Act and Rule 204-2

(Against ICP)

97.     The Commission repeats and realleges Paragraphs 1 through 69 of this Complaint as if fully set forth herein.

98.     At all relevant times, Defendant ICP operated as an investment adviser as defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)], and served in that capacity with respect to its clients and investors.

99.     Defendant ICP made use of the mails and means and instrumentalities of interstate commerce in connection with its business as an investment adviser and was required to make and keep certain prescribed records as necessary or appropriate in the public interest and for the protection of investors.  Such records were subject at any time to such reasonable periodic, special, or other examinations by representatives of the Commission as the Commission deemed necessary or appropriate.

100.     As alleged herein, Defendant ICP failed to make, keep, maintain on its premises, and provide to the Commission all required records, including but not limited to:  (a) accurate memoranda of each order given by ICP for the purchase or sale of any security, showing the terms and conditions of the order, instruction, modification or cancellation, identifying the person connected with ICP who recommended the transaction to the client and the person who placed such order, and showing the account for which it was entered, the date of entry, and the bank, broker or dealer by or through whom it was executed; and (b) all written agreements (or copies thereof) entered into by ICP with any client.

101.     By reason of the foregoing, Defendant ICP violated, and unless enjoined and restrained will continue to violate, Section 204 of the Advisers Act [15 U.S.C. § 80b-4] and Rule 204-2 [17 C.F.R. 275.204-2].

### EIGHTH CLAIM

**Violations of Section 206(4) of
the Advisers Act and Rule 206(4)-7**

(Against ICP)

102.     The Commission repeats and realleges Paragraphs 1 through 69 of this Complaint as if fully set forth herein.

103.     At all relevant times, Defendant ICP operated as an investment adviser as defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)], and served in that capacity with respect to its clients and investors.

104.     As alleged herein, Defendant ICP failed to implement written policies and procedures reasonably designed to prevent violation by ICP and its supervised persons of the Advisers Act and the rules thereunder.  Additionally, Defendant ICP failed to designate an individual who was a supervised person as responsible for administering its policies and procedures.

105.     By reason of the foregoing, Defendant ICP violated, and unless enjoined and restrained will continue to violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 thereunder [17 C.F.R. 275.206(4)-7].

## NINTH CLAIM

### Control Person Liability Under
### Section 20(a) of the Exchange Act

(Against Priore)

106.     The Commission repeats and realleges Paragraphs 1 through 69 and 73 through 81 of this Complaint as if fully set forth herein.

107.     At all relevant times, Defendant Priore possessed, directly or indirectly, the power to direct and control ICP's and ICPS's management, policies, and operations and was a control person of ICP and ICPS pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)]. Defendant Priore was a culpable participant in ICP's and ICPS's violations of the Exchange Act as described above.

108.     By reason of the foregoing, Defendant Priore is jointly and severally liable as a control person of ICP and ICPS with, and to the same extent as, ICP and ICPS for ICP's and ICPS's violations of Sections 10(b) and 15(c)(1)(A) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78o(c)(1)(A)] and Rules 10b-3 and 10b-5 thereunder [17 C.F.R. 240.l0b-3 and 240.l0b-5], and unless enjoined and restrained, Priore will continue to cause, or will fail to prevent, ICP's and ICPS's violations of these provisions.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court grant the following relief:

## I.

A final judgment permanently enjoining and restraining Defendants ICP, ICPS, ICP Holdco, and Priore, their agents, servants, employees, attorneys, assigns and all persons in active concert or participation with them who receive actual notice of the injunction by personal service

or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## II.

A final judgment permanently enjoining and restraining Defendants ICP, ICPS, ICP Holdco, and Priore, their agents, servants, employees, attorneys, assigns and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, or aiding and abetting violations of, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## III.

A final judgment permanently enjoining and restraining Defendant ICPS, its agents, servants, employees, attorneys, assigns and all persons in active concert or participation with ICPS who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 15(c)(1)(A) of the Exchange Act [15 U.S.C. § 78o(c)(1)(A)] and Rule 10b-3 thereunder [17 C.F.R. 240.10b-3].

## IV.

A final judgment permanently enjoining and restraining Defendants ICP and Priore, their agents, servants, employees, attorneys, assigns and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from aiding and abetting violations of Section 15(c)(1)(A) of the Exchange Act [15 U.S.C. § 78o(c)(1)(A)] and Rule 10b-3 thereunder [17 C.F.R. 240.10b-3].

## V.

A final judgment permanently enjoining and restraining Defendants ICP and Priore, their agents, servants, employees, attorneys, assigns and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, or aiding and abetting violations of, Sections 206(1), 206(2), 206(3) and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1)-(4)] and Rule 206(4)-8 thereunder [17 C.F.R. 275.206(4)-8].

## VI.

A final judgment permanently enjoining and restraining Defendants ICPS and ICP Holdco, their agents, servants, employees, attorneys, assigns and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from aiding and abetting violations of Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. 275.206(4)-8].

## VII.

A final judgment permanently enjoining and restraining Defendant ICP, its agents, servants, employees, attorneys, assigns and all persons in active concert or participation with ICP who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Sections 204 and 206(4) of the Advisers Act [15 U.S.C. § 80b-4 and 80b-6(4)] and Rules 204-2 and 206(4)-7 thereunder [17 C.F.R. 275.204-2 and 275.206(4)-7].

## VIII.

A final judgment permanently, enjoining and restraining Defendant Priore, his agents, servants, employees, attorneys, assigns and all persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from controlling any person who violates Sections 10(b) or 15(c)(1)(A) of the Exchange Act [15 U.S.C. §§ 78j(b) or 78o(c)(1)(A)] and Rules 10b-3 or 10b-5 thereunder  [17 C.F.R. 240.10b-3 or 240.10b-5].

## IX.

A final judgment ordering Defendants ICP, ICPS, ICP Holdco, and Priore to disgorge, with prejudgment interest thereon, all illicit profits or other ill-gotten gains received, and all amounts by which ICP, ICPS, ICP Holdco, and Priore have been unjustly enriched, as a result of the misconduct alleged in this Complaint, including, as to each Defendant, their own illicit profits, ill-gotten gain, or unjust enrichment, and such other and further amounts as the Court may find appropriate.

## X.

A Final Judgment ordering Defendants ICP, ICPS, ICP Holdco, and Priore to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e)(1) of the Advisers Act [15 U.S.C. § 80b-9(e)].

## XI.

Granting such other and further relief as the Court deems just and proper, including such equitable relief as may be appropriate or necessary for the benefit of investors.

## DEMAND FOR JURY TRIAL

Under Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by jury in this action of all issues so triable.

Dated: June 21, 2010
New York, New York

By:

_George S. Canellos (GC-8092)_
SECURITIES AND EXCHANGE COMMISSION
Regional Director
New York Regional Office
3 World Financial Center
New York, NY 10281
Tel: (212) 336-1100

Of Counsel:
Andrew M. Calamari
Celeste A. Chase
Joseph O. Boryshansky
Susannah M. Dunn
Joshua R. Pater