UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
SECURITIES AND EXCHANGE COMMISSION,

                            Plaintiff,

              -against-                                         10 Civ. 4791 (LAK)

ICP ASSET MANAGEMENT, LLC, et al.,

                            Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION**

                    Appearances:


                                Joseph O. Boryshansky
                                Mark S. Germann
                                Joshua R. Pater
                                SECURITIES AND EXCHANGE COMMISSION
                                *Attorneys for Plaintiff*


                                Emily J. Mathieu
                                James M. Roberts
                                Simon J. Miller
                                THOMPSON HINE LLP
                                *Attorneys for Relief Defendant Bertrand H. Smyers*


LEWIS A. KAPLAN, *District Judge.*

                    The Securities and Exchange Commission ("SEC" or "Commission") brought this

action principally against Thomas C. Priore, ICP Asset Management, LLC, and other entities

controlled by him (collectively, "ICP") for alleged repeated violations of the federal securities laws.[1]

---
[1]

              Amended complaint ("Cpt.") ¶ 1.

At the heart of the claim is ICP's activities with respect to four multibillion dollar collateralized debt obligations know as the Triaxx CDOs. According to the complaint, Priore and ICP, as the mortgage market declined, repeatedly engaged in improper transactions that defrauded the Triaxx CDOs of tens of millions of dollars in order to protect another ICP client against losses and to line their own pockets.[2]

Relief defendant Bertrand H. Smyers – to whom Priore allegedly transferred millions of dollars in personal assets as trustee of various trusts, as the storm clouds gathered and the risk of substantial personal liability approached – moved to dismiss the complaint as to him.[3] He argued that the complaint fails to state a claim against him under the Federal Debt Collection Procedures Act ("FDCPA")[4] and, on that assumption, that there is no basis for this Court to exercise personal jurisdiction over him.[5] The Court previously denied the motion.[6] This opinion sets forth its reasoning.

*Facts*

What is important at present is not the details of the SEC's substantive allegations against Priore and ICP, but the relationship of the SEC's investigation to allegedly fraudulent conveyances by Priore and his wife to Smyers as trustee. The amended complaint, the allegations

---

[2]  *Id.* ¶ 2.

[3]  *See* DI 70.

[4]  28 U.S.C. §§ 3301 *et seq.*

[5]  DI 70.

[6]  DI 114.

of which are taken as true for purposes of this motion, asserts the following.[7]

In March 2009, the SEC began an on-site examination of, among other things, Priore's and ICP's conduct in relation to the Triaxx CDOs and other ICP-managed accounts. Its staff interviewed Priore and other ICP personnel and made a number of requests for information.[8] At the time the on-site examination began, Priore owned residences in Westchester County, New York, and Martha's Vineyard, Massachusetts, properties on which he long had been making mortgage and other loan payments.[9]

In or about September and early October 2009, the SEC's interest in Priore and ICP apparently increased. It issued a document preservation notice as well as subpoenas for documents and for testimony from Priore and another.[10] These developments were known to Priore[11] and were followed in October by admissions from Priore's and ICP's counsel that ICP had garnered $24 million in fees that it would not have earned but for certain questionable transactions involving the Triaxx CDOs.[12]

---

[7]     Smyers submitted a declaration in support of the motion. DI 72. The declaration, however, is addressed entirely to the question whether there is personal jurisdiction over Smyers in the event that the amended complaint fails to allege a legally sufficient claim against him under the FDCPA and therefore has no bearing on his Rule 12(b)(6) motion. For the sake of good order, however, I note that I have excluded the declaration for purposes of that motion. *See* FED. R. CIV. P. 12(d).

[8]     Cpt. ¶ 74.

[9]     *Id.* ¶¶ 73, 80.

[10]     *Id.* ¶ 75.

[11]     *Id.* ¶¶ 74-75.

[12]     *Id.* ¶ 76.

4

In mid-October – after the issuance of the subpoenas and shortly after counsel made these admissions – Priore met with an estate planning attorney and began the process of establishing the following trusts:

- The "Lori A. Priore Revocable Trust" (the "LAPR Trust"), established for the benefit of family members. The LAPR Trust, when eventually signed, designated Priore and his wife as co-trustees and gave his wife the power to appoint and remove trustees during her lifetime and to direct the disposition of trust property.

- The "Thomas C. Priore Thirty-Five Year Qualified Personal Residence Trust" (the "TCP QPRT"). The TCP QPRT, an irrevocable trust, when signed, designated Priore, his wife, and Smyers as co-trustees and gave them the power to dispose of trust property for the benefit of Priore.

- The "Lori A. Priore Thirty-Two Year Qualified Personal Residence Trust" (the "LAP QPRT"). The LAP QPRT, also irrevocable, when signed, designated Priore, his wife, and Smyers as co-trustees and gave them the power to dispose of trust property for the benefit of Mrs. Priore.[13]

On March 8, 2010, the SEC staff informed counsel for Priore and ICP that it soon would issue Wells notices to Priore and ICP – i.e., notices indicating that the staff intended to recommend to the Commission that it charge Priore and ICP with federal securities law violations.[14] On the following day, staff advised Priore's counsel that it expected that the Commission would charge Priore and ICP with fraud.[15]

Priore and his wife acted promptly. During the March 15-18, 2010 period, Priore transferred the Martha's Vineyard residence to himself and his wife as tenants in common, each with a 50 percent interest, and they in turn transferred their interests to the TCP QPRT and the LAP

---

[13]   *Id.* ¶ 77.

[14]   *Id.* ¶ 78.

[15]   *Id.* ¶ 79.

QPRT, respectively, for $1 each.[16]  On March 18, 2010, Priore transferred the Westchester property to himself and his wife as trustees of the LAPR Trust – a trust that is revocable solely by Mrs. Priore.[17]

   The two properties thus transferred represented a substantial portion of Priore's assets.  Priore previously had not been engaged in estate planning or created trusts to administer his personal assets.  The transfers were made with knowledge of the Commission's threatened fraud charges and awareness of Priore's potential exposure to millions of dollars of liability.  According to the complaint, the transfers were made for the purpose of hindering the Commission's ability to collect disgorgement, penalties, and interest from him in the event it prevailed in the threatened action.[18]

   As Smyers serves as a trustee for the TCP QPRT and the LAP QPRT, he is named as a relief defendant in this suit.  Despite this connection to Priore and the alleged fraudulent transfers, Smyers argued that the complaint fails to state a cause of action against him under the FDCPA and that this Court lacks personal jurisdiction over the state law claims brought against him. Each argument is analyzed below.

*Discussion*

*The FDCPA Claims*

   The FDCPA allows the United States "to recover a judgment on a debt; or . . . to

---

[16]  *Id.* ¶ 79a.  All of these transfers occurred in the Southern District of New York.  *Id.*

[17]  *Id.* ¶ 79b.

[18]  *Id.* ¶ 82.

obtain, before judgment on a claim for a debt, a remedy in connection with such a claim.[19]  Its purpose was "to create a comprehensive statutory framework for the collection of debts owed to the United States government" in order to "improve the efficiency and speed in collecting those debts."[20]

Smyers argued that the amended complaint fails to state a cause of action against him under the FDCPA for two reasons.  First, he relied on the language in Section 3304(b)(1)(A)-(B) to argue that the FDCPA claims were insufficient because the complaint does not allege that he is a "debtor" or that he made the transfer in question.[21]  Second, in an argument first raised in his reply memorandum, Smyers asserted the SEC did not state a claim under Section 3304(b) because it had not alleged that a debt currently exists in light of the fact that the Act defines "debt" as "an amount *that is owing to* the United States."[22]  Smyers' arguments, however, betrayed a fundamental misinterpretation of the FDCPA.

Smyers essentially abandoned his first argument, viz. that the SEC must allege that

---

[19]

28 U.S.C. § 3001(a).

It defines "debt" as "an amount that is owing to the United States on account of" various specified "source[s] of indebtedness to the United States." *Id.* § 3002(3).

[20]

H.R. REP. NO. 736, 101st Cong., 2d Sess. (1990), *reprinted in*, 1990 U.S.C.C.A.N. 6472, 6630, 6631.

Before the FDCPA became law, the United States was required to collect debts according to the laws of different states which impeded its collection efforts. *Id.* at 6631-33.

[21]

DI 71, at 16.

[22]

28 U.S.C. § 3002(3) (emphasis added); *see* DI 88, at 3-4.

he is a "debtor" to proceed under the FDCPA, in his reply memorandum and at oral argument.[23]  In any event, this argument was unconvincing because the provisions of the Act cited by Smyers simply list the elements required to establish that a fraudulent transfer occurred; they do not specify or restrict who can be named as a defendant in a fraudulent transfer action.[24]  Moreover, several sections of the FDCPA specifically provide that a transferee who is party to a fraudulent transfer is subject to suit.  For example, Section 3307 provides that a judgment may be entered "against . . . the first transferee of the asset or the person for whose benefit the transfer was made; or . . . any subsequent transferee . . . ."[25]  Section 3306 states also that the SEC can obtain "a remedy under this chapter against the asset transferred or other property of the transferee."[26]  Finally, case law supports the proposition that an FDCPA claim lies against a transferee.[27]  Smyers' first FDCPA argument therefore was wholly without merit.

　　　　Smyers second argument stated that he is not a proper defendant because no debt currently is owing to the United States.[28]  In other words, Smyers contended that claims brought under 28 U.S.C. § 3304(b) must allege that a debt exists and, because the Act defines "debt" as "an amount owing to the United States," no debt exists here.  In addressing Smyers' second contention,

---

23

　　　　*Id.*; *see also* Transcript, Dec. 13, 2011 ("Tr."), at 12-13 (noting that the "crux" of Smyers' argument was that a debt is not currently owing to the United States).

24

　　　　*See* 28 U.S.C. § 3304(b)(1)(A)-(b)(1)(B).

25

　　　　28 U.S.C. § 3307(b).

26

　　　　*Id.* § 3306(a)(2).

27

　　　　*See, e.g.*, *United States v. Moore*, 156 F. Supp. 2d 238, 247 (D. Conn. 2001); *United States v. Walston*, No. 07 Cr. 580, 2011 WL 3876932, at *2-4 (N.D. Ill. Aug. 31, 2011).

28

　　　　*See* 28 U.S.C. § 3001(c).

this Court naturally begins its analysis the statute's text.  At the outset, however, it is important to note the structure of the Act because some of the definitions and terms apply only to certain of its subchapters.

The FDCPA is divided into four subchapters.  Subchapter A includes definitions for the entire chapter and general provisions.  Subchapter B addresses prejudgment remedies, Subchapter C postjudgment remedies, and Subchapter D – under which the SEC's claims against Smyers are brought – fraudulent transfer claims.  The latter includes definitions that apply only to fraudulent transfer actions.

Although the use of the present tense in the definition of "debt"[29] appears to support Smyers' argument that a present or outstanding debt must exist to proceed under Section 3304(b), other provisions in the FDCPA suggest that the term "debt" includes contingent claims, at least in the fraudulent transfer context.  Indeed, Section 3304, which is part of Subchapter D, addresses the fact that actionable fraudulent transfers can be made before a "debt" arises and states that "a transfer is fraudulent as to a debt to the United States, *whether such debt arises before or after the transfer is made* . . . [if such transfer is designed to] hinder, delay, or defraud a creditor."[30]

Moreover, when other defined terms in Subchapter D are analyzed, it becomes clear that a fraudulent transfer claim properly can be raised before a debt is "owing" to the United States.  First, Subchapter D defines "claim" as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed,

---

[29]

     *Id.* § 3002.

[30]

     *Id.* § 3304(b)(1) (emphasis added).

legal, equitable, secured, or unsecured."[31]   Thus, for the purposes of the fraudulent transfer subchapter, the term "claim" is defined extremely broadly, just as it is in other pertinent statutes and uniform acts, including the Bankruptcy Code, the Uniform Fraudulent Transfer Act ("UFTA"), and the Uniform Fraudulent Conveyance Act ("UFCA").[32]   Second, Subchapter D defines "creditor" as a "person who has a claim."[33]   Putting these definitions together, it becomes clear that the SEC, on behalf of the United States, is a creditor and has a fraudulent transfer claim against Smyers for a debt that may mature after the allegedly fraudulent transfer.[34]   Having established that the SEC is a creditor with a claim, Smyers must be a "debtor" because he, in the words of the FDCPA, is "a person who is liable for a debt *or against whom there is a claim for a debt*."[35]   Accordingly, in reading all of the relevant provisions of the FDCPA together, this Court concludes that the SEC has

---

[31]

    *Id.* § 3301.

[32]

    *See* 11 U.S.C. § 101 (defining "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . . ."); UNIF. FRAUDULENT TRANSFER ACT § 1(3) (1984), 7A Pt. II U.L.A. 14 (2006); UNIF. FRAUDULENT CONVEYANCE ACT § 1 nn. 42-45 (1918), 7A Pt. II U.L.A. 259-60 (2006).

[33]

    28 U.S.C. § 3301.  Again, the FDCPA's definition of "creditor" mimics the definition in the Bankruptcy Code and the earlier uniform acts.  *See* 11 U.S.C. § 101 (defining "creditor" as an "entity that has a claim against the debtor that arose at the time of *or before the order for relief concerning the debtor*") (emphasis added); UNIF. FRAUDULENT TRANSFER ACT § 1(4) (1984), 7A Pt. II U.L.A. 14 (2006); UNIF. FRAUDULENT CONVEYANCE ACT § 1 (1918), 7A Pt. II U.L.A. 248 (2006) (defining "creditor" as "a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent.").

[34]

    The terms "claim" and "creditor" are not defined with regard to Subchapters A-C and apply only to Subchapter D of the FDCPA.  Thus, when the text of the statute is viewed in its entirety, it becomes clear that Congress defined and included specific terms in Subchapter D to allow for contingent claims in the fraudulent transfer context.  *See* 28 U.S.C. § 3304(b)(1).

[35]

    *Id.* § 3301 (emphasis added).

a "claim" against Smyers, who therefore is a "debtor" within the meaning of the FDCPA.[36]

This conclusion is confirmed by the historical precursors to the FDCPA.  In 1929, the New York Court of Appeals noted that the UFCA "abrogate[d] the ancient rule whereby a judgment and a lien were essential preliminaries to equitable relief against a fraudulent conveyance."[37]  This aspect of the UFCA was carried over into and exists in the UFTA as well.[38] As these earlier uniform acts allowed fraudulent transfer claims with respect to contingent "debts," and as Subchapter D is based on the UFTA, Congress seemingly intended the fraudulent transfer subchapter of the FDCPA to allow contingent claims for debts.[39]

The legislative history of the FDCPA reinforces this conclusion as well.  As noted previously, Congress designed the FDCPA to facilitate and improve the federal government's collection efforts.[40]  In order to achieve this purpose, the House Report on the FDCPA notes that the

---

[36]
>   *See* 11 U.S.C. § 101 (defining "debt" as "liability on a claim"); *In re Mazzeo*, 131 F.3d 295, 301-02 (2d Cir. 1997) (noting that the terms "debt" and "claim" are coextensive for the purposes of the Bankruptcy Code); *see also* UNIF. FRAUDULENT TRANSFER ACT § 1(5) (1984), 7A Pt. II U.L.A. 14 (2006) (same); UNIF. FRAUDULENT CONVEYANCE ACT § 1 (1918), 7A Pt. II U.L.A. 248 (2006) (defining "debt" as "any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent.").

[37]
>   *Am. Sur. Co. v. Conner*, 251 N.Y. 1, 7 (1929) ("The act is explicit that a creditor may now maintain a suit in equity to annul a fraudulent conveyance, though his debt has not matured.").

[38]
>   *See, e.g.*, *United States v. Brickman*, 906 F. Supp. 1164 (N.D. Ill. 1995) (noting that, under the UFTA, when a person or entity brings a fraudulent conveyance action and asserts a claim, that person is considered a "creditor" even if its claim is contingent and even if its claim has not matured or has yet to be reduced to judgment until after the conveyance).

[39]
>   *See Schueler v. Rayjas Enters., Inc.*, 847 F. Supp. 1147, 1170-71 (S.D.N.Y. 1994) (quoting a statement to the Senate that Subchapter D "is modeled on [the UFTA] . . . [and] can be used both before and after judgment").

[40]
>   *See* H.R. REP. NO. 736, 101st Cong. 2d Sess. (1990), *reprinted in*, 1990 U.S.C.C.A.N. 6472, 6631.

Act defined the term debt "broadly" – not narrowly as Smyers argued.[41]  Furthermore, a floor speech discussing specific provisions of the FDCPA suggests that the language in the definition of "debt" that Smyers relied on – "an amount that is owing to the United States" – was drafted "to make clear that the Act will not apply to obligations which began as *purely private* loan or contract obligations."[42]  Thus, it appears that the Act's definition of "debt" was intended to ensure that the government did not use the FDCPA to recover private debts, not to restrict the United States from asserting claims with respect to fraudulent transfers like those at issue here.

        Finally, although it appears that decisions based on the FDCPA have taken the fact that a fraudulent transfer claim can be brought as part of a suit seeking to establish the existence of a debt for granted, cases that apply the FDCPA concur that fraudulent transfer claims are properly asserted against a defendant even though the underlying claim is disputed.  For example, in *United States v. Dickerson*, 790 F. Supp. 1583, 1584-85 (M.D. Ga. 1992), the court considered whether a fraudulent transfer claim was properly asserted where the plaintiff sought "to secure payment of its *disputed* CERCLA recovery claim."[43]  It had no difficulty concluding that the action was a "claim for a debt" and that the FDCPA applied to the action.[44]  In contrast, all of the cases that Smyers relied upon to support his narrow reading of the FDCPA's definition of debt construe claims brought under Subchapters A-C of the Act – subchapters in which the terms "claim" or "creditor" are not

---

[41]
       *Id.* at 6636.

[42]
       136 Cong. Rec. H13288 (daily ed. Oct. 27, 1990) (emphasis added).

[43]
       *Dickerson*, 790 F. Supp. at 1585 (emphasis added).

[44]
       *Id.*

defined or applicable.[45]

        Accordingly, when the text of the FDCPA, its historical precursors, and its legislative history are analyzed, it is clear that the Act allows the government to bring contingent claims for debts to recover allegedly fraudulent transfers.

*Pendent Jurisdiction*

        As the SEC states a claim against Smyers under the FDCPA, there is no need to consider whether this Court would have personal jurisdiction over the state law claims against Smyers, assuming that the federal claims were insufficient.  Indeed, pendent jurisdiction gives this Court jurisdiction over those claims because the FDCPA allows for nationwide service of process and because the state law claims "derive from a common nucleus of operative fact[s]."[46] Recognizing the applicability of pendent personal jurisdiction, Smyers conceded at oral argument that "if your Honor finds that the amended complaint states a cause of action against my client under the federal statute [FDCPA], then, yes, we concede that there would be pendant [*sic*] . . . jurisdiction."[47]

---

[45]

        *See United States v. Dearborn Refining Co.*, 777 F. Supp. 2d 1077 (E.D. Mich. 2011) (involving Subchapter C); *Gonzalez v. Dep't of Labor*, 603 F. Supp. 2d 137 (D.D.C. 2009) (involving both Subchapters B and C); *United States v. Cap Quality Care, Inc.*, 400 F. Supp. 2d 295 (D. Me. 2005) (involving Subchapter B).

[46]

        *See, e.g.*, *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056-57 (2d Cir. 1993) (internal quotation omitted); *see also* 28 U.S.C. § 3004(b)(1)(A) (noting that the FDCPA has nationwide service of process); Cpt. ¶¶ 73-82 (describing how the state law claims and FDCPA claims are based on the same factual evidence).

[47]

        Tr. at 2; *see also id.* at 12.

*Conclusion*

For the reasons stated above, Smyers' motion to dismiss [DI 70] was denied in its

entirety.

SO ORDERED.

Dated:        January 24, 2012

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)